IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | |
|---|---|
| TOMMY REECE, JR. ) | |
| ) | |
| CLAIMANT, ) | |
| ) | Civil Action No: |
| v. ) | 6:16-CV-00494-KOB |
| ) | |
| NANCY A. BERRYHILL, acting ) | |
| Commissioner of Social Security ) | |
| ) | |
| RESPONDENT. ) | |
| ) | |

MEMORANDUM OPINION

I. INTRODUCTION

On June 10, 2013, the claimant, Tommy Reece, filed for disability benefits under Title II of the Social Security Act. (R. 131). In his application, the claimant alleged disability beginning on May 31, 2013 because of cirrhosis, esophageal varices, and diabetes mellitus (R. 131, 161). The Commissioner initially denied the claims on September 5, 2013. The claimant filed a timely request for a hearing before an Administrative Law Judge on September 10, 2013. (R. 10) On February 9, 2015, the claimant amended his onset date to September 21, 2013 (R. 10, 158). The ALJ held a hearing on February 9, 2015. (R. 27-54).

In a decision dated April 20, 2015, the ALJ found that the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for social security benefits. (R. 10-22). On January 27, 2016, the Appeals Council denied the claimant's request for review. (1-4). Consequently, the ALJ's decision became the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted his administrative remedies, and this court has

1

jurisdiction pursuant to U.S. C. §§405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the commissioner.

## II. ISSUE PRESENTED

Whether the ALJ explicitly articulated reasons supported by substantial evidence for discrediting the claimant's subjective testimony.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the ALJ's decision if she applied the correct legal standards and if substantial evidence supports her factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No...presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions,...but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(D). Whether the claimant meets a Listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and

the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhard*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F. 2d at 000. A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423 (d)(1)(A), a person is entitled to disability benefits when the person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which as lasted or can be expected to last for a continuous period of not less than 12 months..." 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

# V. FACTS

The claimant was fifty-one years old at the time of the ALJ's final decision (R. 22); completed the tenth grade (R. 167); has past relevant work as a motorcycle sales owner and production supervisor (R. 186-187); and alleges disability based on diabetes mellitus, cirrhosis of the liver, esophageal varices, hypertension, and obesity (R. 12).

*Physical Impairments*

On December 2, 2009 the claimant sought treatment with Dr. Vanessa Ragland and Dr. Mangesh Shukla at Lakeland Community Hospital for bleeding and abdominal pain. On December 4, Dr. Shukla diagnosed the claimant with acute esophagitis with varices. (R. 235). On December 25, a CT scan of the abdomen and pelvis indicated mild diffuse fatty infiltration of the liver. On December 28, the claimant sought treatment with Dr. Gerard Haggstrom, at Eliza Coffee Memorial Hospital for a GI bleed and multiple large varices found in the lower and middle third of the esophagus, and Dr. Shukla performed an esophagogastroduodenoscopy (EGD) and applied rubber band ligations on January 11, 2010. (R. 246-248, 326).

He returned to Eliza Coffee on February 2 seeking treatment for hematemesis, and Dr. John Scarborough admitted the claimant to the ICU for respiratory failure secondary to an upper GI bleed. On Februrary 3, Dr. Shukla performed an EGD and applied a total of four rubber bands to control bleeding before the patient returned to the ICU; he was discharged on February 8. During this hospital visit, the claimant indicated he had no lower abdominal pain until the bleeding began in December 2009. (R. 303-306).

The claimant saw specialist Dr. Joseph Bloomer at UAB Hospital's Department of Gastroenterology & Hepatology on February 16, 2010 for treatment of his cirrhosis with portal

hypertension. Dr. Bloomer noted the claimant's liver function was "too good" to consider him for liver transplantation. Dr. Bloomer also noted that he assured the claimant of other ways to manage his portal hypertension and variceal bleeding in case the ligation banding did not control the bleeding. An abdominal Doppler exam indicated mild hepatic steatosis (fatty liver disease) (R. 251-255).

From March 2010 to October of 2011, the claimant sought treatment with Dr. Shukla for serial rubber band ligations of his esophageal varices on ten different occasions, but the doctor never mentioned any physical limitations in any of the medical records. On March 22, Dr. Shukla switched the claimant's beta blocker medication from Propranolol to Nadolol. Upon each visit, Dr. Shukla recommended followup ligations of the esophageal varices. (R. 260-278). The record contains no medical recrods from October 2011 through August 2012.

The claimant saw Dr. Jeffery Long on August 28, 2012 at Family Medical Associates in Haleyville for prescription medication refills for his diabetes. Under "Review of Symptoms," Dr. Long noted that the claimant's diabetes, cirrhosis and esophageal varices presented no symptoms at that time. (R. 350). On March 26, 2013, the claimant returned to Dr. Long for prescription medication refills. He continued to treat the claimant with Nadolol. Additionally, Dr. Long noted that the claimant was in no acute distress and that all chronic conditions were stable. (R. 348).

On June 25, 2013, the claimant completed an Adult Function Report explaining that on a normal day he watches T.V., sits on the porch, and feeds his three chickens. He also noted that he could not lift anything because his medication caused him to have "no energy." The claimant alleges he does not cook except for sandwiches and hotdogs. He also stated that he does yard work by operating his riding mower twice a month. The claimant noted that he goes outside daily; drives his

5

own car; can shop for the "basics" on his own; does not spend time with others; and goes to "hang out" at the motorcycle shop. In explaining his physical abilities, he states that his impairments have affected his lifting, squatting, standing, walking, kneeling, stair climbing, memory, completing tasks, concentration, understanding, and using hands. He noted that his doctor said "do not lift" things because it could "bust" blood vessels. He claimed to be able to walk fifty feet before needing to stop and rest for five minutes. Lastly, he claimed to have used glasses, which were prescribed when he was seven years old. (R. 195-202).

At the request of the Social Security Administration, Dr. Richard Crittenden, an internal medical doctor, evaluated the claimant's physical condition at MDSI Physician Services in Tuscaloosa. On August 24, 2013, Dr. Crittenden personally examined the claimant and reviewed his medical records. The claimant reported that a previous doctor "told me not to lift anything over ten pounds or it would bust these vessels, and not to stress myself; to live a stress-free life." Dr. Crittenden noted the claimant reported fatigue and weakness secondary to Nadolol; however, the claimant denied any pain. The claimant told Dr. Crittenden his weakness limits his standing and walking to ten minutes. Dr. Crittenden noted that the claimant's 80 mg dosage of Nadolol is within the "usual" limits, with the maximum dosage being 240 mg. The claimant reported that he has been noncompliant with followup EGD's because of a lack of insurance. He also reported to Dr. Crittenden that he last worked in May 2013. (R. 365)

Regarding his activities of daily living, the claimant told Dr. Crittenden that he does not cook except for simple items such as a sandwich; however, he participates in chores such as cleaning dishes, sweeping and dusting. He reported that on a typical day he sits and watches television, but occasionally feeds his chickens. He also reported driving an automobile and leaving the house about

three to four times a week. (R. 365).

Dr. Crittenden listed the claimant's medications as Nadolol, Glyburide, Metformin, Pantoprazole, and Vitamine E. (R. 366).

During his physical examination of the claimant, Dr. Crittenden noted that the claimant walked into the exam room with no discomfort and without assistance; had a normal paced gait; appeared to sit comfortably; could get on and off the exam table without assistance; could toe-heel walk and squat and rise; and had normal motor strength of 5/5. Dr. Crittenden's diagnosis included cirrhosis with esophageal varices causing the claimant to avoid excessive straining. Dr. Crittenden noted that avoiding straining by heavy lifting is not typically a standard treatment for esophageal varices; however, he stated that, because the claimant cannot afford EGD banding, "avoiding excessive straining is prudent." In his opinion, the original lift limit of 10 pounds was "unnecessarily" small and amended the claimant's lifting limit to 40 pounds. However, Dr. Crittenden noted no limitations of fine/gross manipulative activities, postural limits, or workplace environmental activities. (R. 367-369).

Several months later, on April 4, 2014, the claimant returned to Dr. Jeffery Long for prescription medication refills for the his diabetes, reflux, and blood pressure. Dr. Long noted that the claimant denied fatigue and weakness. (R. 371).

The claimant returned to Dr. Shukla on December 22, 2014, for a followup of his esophageal varices and cirrhosis of the liver. Dr. Shukla noted that the claimant was last seen in his office in December 2009 and performed multiple outpatient procedures on the claimant. He complained of intermittent lower left quadrant abdominal pain, which started "a couple years ago." According to the claimant, the pain has no relieving or exacerbating factors. Dr. Shukla also noted that he

performed the claimant's last EGD banding on October 10, 2011. Under the physical exam, Dr. Shukla noted the claimant had no muscle weakness. The "Review of Systems" section indicated negative signs of fatigue, chest pain, spitting up blood, muscle pain, and bleeding or bruising tendency, among many others; however, it indicated positively for blurred vision, shortness of breath, joint pain or swelling, rash, itching, abdominal pain, rectal bleeding, memory loss or confusion, and depression. Lastly, in the "Plan" section, Dr. Shukla noted that the patient has advanced cirrhosis of the liver complicated by esophageal varices, and that "he is disabled due to these conditions." (R. 375-376).

On January 13, 2015, Dr. Shukla addressed a "To Whom it May Concern" Letter to a Mr. Morris Bramlett, the claimant's attorney. Dr. Shukla listed the claimant's EGD procedures from December 2009 through October 2011. He noted that he was aware that the claimant applied for disability, and that because of the claimant's diagnosis combined with the recurring esophageal varices, the claimant is "disabled and unable to work in any manner." (R. 374).

*The ALJ Hearing*

At the hearing before the ALJ on February 9, 2015, the claimant testified that he owned a motorcycle repair shop until 2013. He said that he stopped operating the shop when he divorced and received all the rights and interests; however, he would continue to "go out there and hang around." When asked why he cannot work, the claimant testified that Dr. Shukla told him not to lift anything and to "live a stress-free life." He testified that Dr. Shukla did not specify a limit as to the amount of weight he could lift. According to the claimant, he quit school in tenth grade and has been a laborer all his life; he did not go to vocational rehabilitation because he did not think there was a job in Haleyville that he was able to perform. (R. 29-32, 34, 38, 46).

8

The claimant testified that he was not receiving any treatment for his cirrhosis, but Dr. Shukla sent him to Birmingham for a consult for a liver transplant. He stated that the specialist, Dr. Bloomer, in Birmingham said that his liver function was too good for a transplant. The claimant also testified that he was not receiving treatment for his esophageal varices since 2011. He discontinued his visits to Dr. Shukla because he lost his insurance. He stated that he is taking high blood pressure medication to keep from "busting veins in my esophagus tube." He stated he cannot stand up for ten to fifteen minutes at a time or walk to the mailbox because his heart "won't beat right."(R. 32-35).

The claimant testified that losing weight helped his diabetes, but his heart medication was to keep his veins from "busting." He stated that he went every six weeks for a year to repair his varices, but the varices would also "shoot blood through the mouth . . . sometimes every two days." He stated at that time he was working as a mechanic at his shop, but had to quit after a while because he would keep bleeding. He stated that doctors have not treated his varices in a while because he lost his insurance. The claimant testified that after seeing Dr. Shukla in December of 2014, the doctor believed he had died because the last time he had seen him, Dr. Shukla estimated that the claimant had only a year to live.[1] (R. 36-41)

When asked about his current symptoms, the claimant stated he still had episodes of bleeding from "both" places and that his stomach hurts all the time. He testified that blood comes up from his mouth once or twice a week and that his stool is "like black tar." When asked to scale his pain in his abdomen on a scale of zero to ten, the claimant stated that his pain is usually a five, but on a bad day it is "sometimes" a ten, with sharp but not constant pain, "like someone stuck a knife" in his gut. He also stated that he has no energy. (R. 42-43).

---

[1]This comment from Dr. Shukla was not present in the medical records.

The claimant stated that he can stand for ten-to-fifteen minutes before having to sit down and rest; can walk about 120 feet before having to rest; can bend from the waist until he puts pressure on it and has "not unbearable" stomach pain; cannot squat or kneel; and he does not try to pick up weight because, during his time as a mechanic, he would "turn wrenches" with little exertion and would then have to go in for an EGD banding the next day. (R. 44-46).

Describing daily life, the claimant testified that he can take a bath; get dressed; do the dishes; dust; and grocery shop by himself, but will have to take breaks to lean on his basket. The claimant stated that he spends his days sitting on the sofa watching TV and will walk out to feed his pet chickens. He does not drive often, probably two or three times a week, but that he does not have the money to go anywhere. He stated that he does not have a social life, and his daughter and ex-wife come two or three times a month, but he still goes to the shop occasionally to sit around. He also testified that he had blurry vision, but went to the eye doctor who prescribed glasses in 2014. (R. 46-50).

A vocational expert, Sandra Bruff, testified concerning the type and availability of the jobs that the claimant was able to perform. Ms. Bruff testified that the claimant's past relevant work was a motorcycle sales owner, classified as light, skilled work, and a production supervisor, also classified as light, skilled work. The ALJ asked Ms. Bruff to assume a hypothetical individual with the same education, training, and work experience as the claimant who is limited to a light range of work, as defined under the regulations as limited occasional climbing of ramps and stairs; cannot climb ropes, ladders or scaffolds; and would need to avoid concentrated pulmonary irritants, dangerous moving, unguarded machinery, and unprotected heights. Ms. Bruff testified that the individual could perform both of the claimant's past relevant work. (R. 50-51)

In the second hypothetical, the ALJ asked Ms. Bruff to assume all of the prior limitations except the individual would be lifting and carrying up to ten pounds occasionally and up to five pounds frequently. Ms. Bruff testified that the individual could not perform any of the past relevant work. (R. 51) The ALJ then asked Ms. Bruff if other jobs existed in regional or national economy that the individual could perform. Ms. Bruff replied that this hypothetical individual could perform work as a surveillance systems monitor, classified as a sedentary unskilled job with 187,000 jobs in the nation and 400 in the state of Alabama. (R. 51).

The ALJ then asked Ms. Bruff if any skills would be transferable to any other light jobs and if any light jobs existed that only have the lifting and carrying limitations. Ms. Bruff testified that unskilled light jobs that have lifting restrictions exist, but in reduced numbers. She stated that the hypothetical individual could work as a ticket seller, classified as light, unskilled job with 1,000 jobs in the state of Alabama, and 200,000 in the national economy; a ticket taker, classified as a light, unskilled job with 400 in the state of Alabama, and 141,000 in the national economy; and a parking lot attendant, classified as a light, unskilled job with 750, in the state of Alabama and 131,000 in the national economy. (R. 51-52).

The ALJ's last hypothetical asked Ms. Bruff to assume an individual with the claimant's education, training, and work experience who has the same limitations as the second individual, but would miss work two or more days per month. Ms. Bruff stated that no jobs existed for an individual with those limitations. (R. 53).

*The ALJ's Decision*

On April 20, 2015, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 10). First, the ALJ found that the claimant met the insured status

requirements of the Social Security Act through December 31, 2018 and had not engaged in substantial gainful activity since his alleged amended onset date of September 21, 2013. (R. 12).

Next, the ALJ found that the claimant had the severe impairments of diabetes mellitus; cirrhosis of the liver with esophageal varices; hypertension; and obesity. The ALJ next found that the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 13).

The ALJ considered whether the claimant met the criteria for Listings 4.02, for chronic heart failure; 5.05 for chronic liver disease; and 9.00 involving endocrine disorders. The ALJ concluded that the record did not establish chronic heart failure with signs of symptoms as described in 4.00D2, and that the record reflects little in the way of heart-related treatment. To support this conclusion, the ALJ noted that the claimant's medical records included an unremarkable study of his heart and normal objective cardiovascular signs on examination, and that his family doctor described his hypertension as "benign." The ALJ also concluded that the record did not demonstrate hemorrhaging from varices or from portal hypertensive gastrophy as defined in Listing 5.05. (R. 13). Additionally, the ALJ noted that the record in general reflects minimal treatment since the alleged onset date. However, while giving the claimant the benefit of the doubt because of lack of insurance, the ALJ found that the record did not establish objective medical evidence to constitute a severe impairment from the listings.

Next, the ALJ determined that the claimant has the residual functioning capacity to perform light work except frequent performance of postural maneuvers such as balancing, stooping, kneeling, crouching and crawling; occasional climbing of ramps and stairs; no climbing ropes, ladders or

scaffolds; and avoiding concentrated pulmonary irritants, dangerous moving and unguarded machinery, and unprotected heights. (R. 14).

In making this finding, the ALJ considered the claimant's symptoms and corresponding medical record. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably cause the alleged symptoms, the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms were not fully credible when compared with the evidence. The ALJ noted that the claimant's subjective statements and allegations were not entirely consistent, therefore, weighing against their overall credibility. (R. 15)

First, she noted that the claimant testified that he applied for disability benefits instead of vocational rehabilitation because he believed no jobs existed in his town that someone of his education and work experience could perform, instead of initially alleging health related issues. The ALJ noted that in April 2013, the claimant denied to Dr. Long any symptoms of fatigue, weakness, or difficulty walking, yet the claimant alleged in his hearing testimony that he was unable to walk more than "50-120 feet or stand for more than 10-15 minutes." She also noted that the claimant's acknowledgment that he can perform some daily living activities suggest more residual functioning capacity than alleged, citing to the Adult Function Report. The ALJ also determined the overall treatment history suggested a lesser degree of symptoms and limitations than the claimant subjectively alleged by noting that the claimant only visited his treating physician's office twice since the alleged onset date of September 2013. Although she acknowledged that the claimant did not seek treatment because of lack of medical insurance, she found no evidence in the record demonstrating that the claimant pursued other means of low cost treatment. (R. 15-16).

In assessing the claimant's liver impairment, the ALJ noted diagnostic imaging studies from

13

2009 and 2010 confirming a fatty liver that developed into cirrhosis. Additionally, she noted that the claimant testified that Dr. Shukla asserted the claimant required a liver transplant before sending him to Dr. Bloomer.[2] However, the ALJ weighed this evidence against the claimant's treating specialist, Dr. Bloomer, who said that the claimant's liver was functioning well "as was typically [the] case with this impairment," and that his liver was "too good to consider him for liver transplantation." The ALJ, therefore, gave more weight to Dr. Bloomer because of his greater degree of specialization, and discredited the claimant's allegations of the severity of his liver diagnosis, also noting a lack of subsequent treatment and objective signs. (R. 16-17).

Regarding the claimant's esophageal varices, the ALJ found that record to demonstrated a "severe" impairment. However, even while giving the claimant "some benefit of the doubt given his insurance problems," the ALJ discredited the claimant's "profound subjective allegations" because of the lack of objective medical abnormalities. The ALJ noted that the claimant indicated that Dr. Shukla allegedly told the him that "he must never lift weight or strain himself or he could 'bust' an esophageal varices and 'bleed out' or die," yet, evidence of these warnings did not appear in any of the claimant's medical records. The ALJ indicated that the claimant's relatively conservative treatment of periodic EGD banding indicated a lesser degree of symptoms than the claimant alleged. (R. 17-18).

The ALJ gave great weight to the opinion of the consultative physician, Dr. Richard Crittenden, given that his examination was the "most comprehensive and relatively recent." The ALJ noted Dr. Crittenden's August 2014 examination of the claimant that demonstrated generally normal, objective cardiovascular signs, abdominal signs, gait, coordination, squatting, use of hands and

---

[2]This assertion by Dr. Shukla is absent from all medical records.

fingers, strength and sensation; Dr. Crittenden's statement that the claimant could lift 40 pounds, which would fall under the category of medium exertional activity; and his assessment that the claimant would have no significant limitations with respect to standing, walking, and sitting. (R. 18-19).

The ALJ gave little weight to Dr. Shukla's statements in December 2014 and January 2015, given that he had not seen the claimant since 2009. The ALJ discredited Dr. Shukla's statements that the claimant was "disabled and unable to work in any manner" because the ALJ found no indication that Dr. Shukla was a vocational expert, nor familiar with Social Security Act's definition of disability. Additionally, the ALJ noted that this opinion lacked explanation or objective medical support and was inconsistent with the general record and his own treatment notes that indicated that the claimant was "objectively normal in all systems." (R. 18).

Finally, the ALJ found that the claimant was capable of performing past relevant work as a motorcycle sales owner and production supervisor. In making this determination, the ALJ relied on the testimony of the vocational expert at the ALJ hearing. The ALJ also determined that the claimant could not return to production supervisor work as actually performed in his past work because it would require the claimant to sometimes lift 50 pounds. However, because the vocational expert and the DOT describe this category of work as less demanding, the ALJ concluded that the claimant could generally perform this type of work. (R. 20-21).

Considering the claimant's additional limitations, the ALJ also noted alternative findings for step five of the evaluation process by indicating other jobs the claimant could perform in the existing national economy based on the vocational expert's testimony involving "an even more limiting residual functional capacity than was actually found." The ALJ determined that based on the

15

testimony of the vocational expert and the claimant's age, education, work experience and residual function capacity, jobs existed in significant numbers in the national economy that the claimant could perform, including working as a ticket seller, ticket taker, and parking lot attendant. Thus, the ALJ concluded that the claimant was not disabled as defined under the Social Security Act. (R. 20-22).

## VI. DISCUSSION

The claimant argues that the ALJ improperly evaluated the claimant's subjective complaints of his limitations under the Eleventh Circuit's pain standard by failing to articulate reasons for discrediting his testimony. This court disagrees and finds that the ALJ properly applied the pain standard and that substantial evidence supports the ALJ's reasons for discrediting the claimant's subjective complaints.

In evaluating a claimant's subjective complaints, the Commissioner must first determine whether the claimant demonstrated an underlying medical condition. *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); 20 C.F.R.§ 404.1529. If the claimant demonstrates an underlying medical condition, the Commissioner must then determine if any objective medical evidence confirms the severity of the alleged pain, or if the underlying medical condition has been objectively confirmed and is so severe that one could reasonably expect it to give rise to the alleged pain. *Id*. Subjective testimony can confirm the severity of alleged symptoms if supported by objective medical evidence. *Foote v. Chater*, 678 F.3d 1553, 1561 (11th Cir. 1995).

Once the ALJ establishes an impairment, evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to objective medical evidence in deciding the issue of disability. *Foote*, 67 F. 3d at 1561. If the ALJ discredits

16

the claimant's subjective testimony, he must articulate explicitly reasons for doing so. *Brown v. Sullivan*, 921 F.2d 1233, 1236 (11th Cir. 1991). If proof of disability is based upon subjective evidence and a credibility determination becomes critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote*, 67 F.3d at 1562 (11th Cir. 1995).

The ALJ properly analyzed the claimant's subjective evidence in the light of the objective medical evidence to determine that the subjective evidence was not medically supported. The ALJ concluded that, although the claimant's medically determinable impairments could reasonably be expected to cause symptoms, the claimant's allegations regarding the intensity, persistence, and limiting effects of these symptoms were not fully consistent with the evidence. (R. 15).

The ALJ specifically considered and articulated reasons supported by substantial evidence for discrediting each of the claimant's subjective claims of pain and functional limitations. The ALJ pointed out that in April of 2013, the claimant denied any symptoms of fatigue, weakness or difficulty walking, yet alleged in 2015 that he could not walk more than 50-120 feet or stand for more than 10-15 minutes. She also found that the claimant's own testimony indicated an inconsistent position because the claimant first claimed that he applied for disability instead of vocational rehabilitation because he did not think any jobs existed in his town that he could perform, before alleging health issues. When evaluating the claimant's overall treatment, the ALJ noted that the claimant only visited his treating physicians twice since the alleged onset date, and that the record did not indicate that he pursued low-cost, or free treatment. This court agrees with the ALJ in that the lack of treatment further demonstrates the inconsistent alleged symptoms and suggests a lesser degree of limitations. (R. 15-16).

17

The ALJ then considered the claimant's allegations of the severity of his liver impairment by noting conflicting medical records, specifically relying upon 2009 and 2010 diagnostic studies to determine that the claimant's liver impairment was "severe." However, even though the claimant reported that Dr. Shukla recommended a transplant, the treating specialist, Dr. Bloomer, established that his liver was "too good to consider him for liver transplantation." (R. 16-17, 253). The court agrees with the ALJ's finding that the medical record in this case does not support these alleged recommendations from Dr. Shukla.

The ALJ also properly found that the objective medical evidence did not support the claimant's allegations regarding his physical limitations from his esophageal varices; that the claimant's longitudinal treatment records do not support his allegation that he cannot lift anything more than ten pounds; and that Dr. Crittenden found that the claimant could lift up to forty pounds and gave the claimant no limitations regarding standing, walking, and sitting. The ALJ specifically cited the Adult Function Report regarding the claimant's various acknowledgments that he can perform household and yard work, indicating more residual functional capacity than the claimant alleged. Therefore, the court agrees with the ALJ that the claimant's allegations regarding the intensity, persistent and limiting effects of symptoms of the disability lacked support from objective medical evidence. (R. 16-18, 365).

The court finds that the ALJ explicitly articulated several reasons for discrediting the claimant's testimony and that those reasons constitute substantial evidence to support the ALJ's determination that the claimant's subjective complaints do not warrant a finding of disability. The ALJ properly evaluated the claimant's allegations consistent with the Eleventh Circuit pain standard and properly characterized the claimant's subjective complaints in light of the objective evidence

presented.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is due to be AFFIRMED.

The court will enter a separate Order in accordance with the Memorandum Opinion

DONE and ORDERED this 22nd day of August, 2017.

_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE